IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**ROBERT MENTZEL,**  )
   Plaintiff,  ) Cause No. 4:19-cv-01923
  )
v.  ) JURY TRIAL DEMANDED
  )
**CITY OF FERGUSON, MISSOURI,**  )
AND **OFFICER EDDIE BOYD III**, in his  )
individual capacity,  )
  )
   Defendants.  )

## COMPLAINT

On July 14, 2014, Officer Eddie Boyd III of the Ferguson Police Department unlawfully arrested Plaintiff Robert Mentzel in retaliation for Mr. Mentzel's exercise of his First Amendment right to peaceably question and record unlawful police action. The City of Ferguson, Missouri, ratified Defendant Boyd's unconstitutional conduct by prosecuting Mr. Mentzel for over a year. Further, the City of Ferguson knew that Defendant Boyd had a history of making false statements and false arrests, along with many other troubling actions as a police officer. Many of these instances were highlighted in the U.S. Department of Justice's report following its investigation of Ferguson. Despite this notorious history, Defendant Boyd is still a member of the Ferguson Police Department.

## JURISDICTION AND VENUE

1. Plaintiff brings this Complaint pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against the states and their municipal divisions through the Fourteenth Amendment.

1

2. The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Mr. Mentzel's action arises under the United States Constitution and § 1343(a)(3) to redress the deprivation of rights secured by the United States Constitution.

3. Venue is proper in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in the City of Ferguson.

4. Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of Ferguson, and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5. This Court has supplemental jurisdiction over the included Missouri state law claims, pursuant to 28 U.S.C. §1367.

6. Mr. Mentzel demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7. Mr. Mentzel is a United States citizen and a resident of the St. Louis County, Missouri.

8. Defendant City of Ferguson, Missouri (hereinafter, "Defendant City") is a body corporate and politic organized and existing pursuant to Missouri law.

9. St. Louis Area Insurance Trust insures Defendant City.

10. The Ferguson Police Department ("FPD") is an instrumentality of Defendant City, organized and controlled pursuant to Missouri law.

11. Defendant Boyd is a sworn peace officer employed by Defendant City. All actions of Defendant Boyd set forth in this Complaint were done under the color of law. Defendant Boyd is sued in his individual capacity.

## FACTS

### A.  Mr. Mentzel's Arrest and Prosecution

12. In the afternoon of July 14, 2014, Mr. Mentzel, his sister, and one of his employees were traveling on Suburban Avenue, en route to mow the grass on one of Mr. Mentzel's properties in the City of Ferguson.

13. Mr. Mentzel's sister was driving the vehicle, a pickup truck with a trailer in tow. Mr. Mentzel sat in the front passenger seat, and his employee sat in the backseat.

14. After Mr. Mentzel's sister turned onto South Harvey Avenue in Ferguson, Defendant Boyd pulled the truck over, ostensibly because the trailer's tail lights were not functioning.

15. Defendant Boyd approached the truck on the driver's side and asked Mr. Mentzel's sister for her license and proof of insurance. She complied.

16. Oddly, Defendant Boyd then asked Mr. Mentzel and his employee to turn over their identification as well.

17. Mr. Mentzel calmly asked why Defendant Boyd wanted their identification, as he and his employee had not committed any traffic violations or criminal acts. *See* Exh. 1, Deposition of Eddie Boyd in *City of Ferguson v. Robert Mentzel*, 15SL-MU00123, Circuit Court of St. Louis County, at 33:8-11.

18. Incensed that Mr. Mentzel had questioned his authority, Defendant Boyd told Mr. Mentzel he would be arrested if he did not provide his identification and demanded the identification a second time.

19. Defendant Boyd did not articulate any probable cause that Mr. Mentzel had committed, or was suspected of committing, a crime.

19. Mr. Mentzel's employee grew nervous and passed her license to Mr. Mentzel. Fearing the consequences of any further inquiries, Mr. Mentzel handed his license and his employee's license to his sister. His sister gave both to Defendant Boyd.

20. Mr. Mentzel was concerned about Defendant Boyd's aggressive demeanor and attempts to intimidate, so he sought to record Defendant Boyd's conduct on a voice recording application on his cell phone. Mr. Mentzel was afraid Defendant Boyd might become violent.

21. However, Mr. Mentzel's attempt to ensure his own physical wellbeing, and that of his sister and employee, only inflamed Defendant Boyd's rage.

22. Defendant Boyd demanded that Mr. Mentzel put his cell phone on the dashboard "for [Defendant Boyd's] safety."

23. Mr. Mentzel was far too shaken to get the application started anyway, so he promptly put his phone on the dash.

24. Immediately, Defendant Boyd walked around the truck to Mr. Mentzel's window on the passenger side. Defendant Boyd told Mr. Mentzel to get out, as he was under arrest.

25. Mr. Mentzel complied. Defendant Boyd handcuffed Mr. Mentzel tightly enough to cause significant pain in Mr. Mentzel's wrists and put Mr. Mentzel in the backseat of FPD vehicle.

26. Thereafter, Defendant Boyd wrote Mr. Mentzel's sister a traffic citation, telling her "If your brother hadn't run his mouth, I wouldn't have given you this ticket."

27. This type of reaction is consistent with claims of retaliation and unlawful arrest that other citizens have made against Defendant Boyd.

28. At the station, Mr. Mentzel heard Defendant Boyd tell a fellow officer that he had arrested Mr. Mentzel because Mr. Mentzel "watches too much CNBC about his rights."

29. Mr. Mentzel was in jail for approximately four hours before his sister could post

his $300 bond.

30. Defendant Boyd initiated two counts of failing to comply against Mr. Mentzel, despite the fact that Mr. Mentzel provided his license and complied with all of Defendant Boyd's unlawful orders. Exh. 1 at 5:15-23; 5:24-25; 6:5-8; 18:17-20; 28:14-25.

31. During the prosecution, Defendant City's attorneys conceded that Defendant Boyd did not have any legal justification to ask for Mr. Mentzel's identification merely because he was a passenger in a vehicle that had been stopped on a minor traffic violation. Neither the State of Missouri nor Defendant City have "stop and identify" laws that permit Defendant Boyd to require a passenger to identify himself during a stop. However, in contravention of established U.S. Supreme Court precedent, Defendant City's attorneys employed circular logic to argue that, when Mr. Mentzel did not immediately comply with the Defendant Boyd's unconstitutional demand, Mr. Mentzel became a suspect in some unnamed crime. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Berkemer* v. McCarty, 468 U.S. 420, 439 (1984); *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 188 (2004) ("[A]n officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop.")

32. Defendant City prosecuted Mr. Mentzel for over a year, until a new prosecutor dismissed the charges.

33. Five years after his arrest, Mr. Mentzel still fears police. He sweats profusely and his breathing quickens when he sees law enforcement. Mr. Mentzel remembers the helplessness he felt in the wake of Defendant Boyd's rage. He knows the power police can exert to punish those who have done nothing wrong.

### B. The U.S. Department of Justice Report

34. On March 4, 2015, the Civil Rights Division of the U.S. Department of Justice

5

published the *Investigation of the Ferguson Police Department*. The published report is incorporated herein as Exhibit 1.

35. The 105-page report details myriad FPD constitutional violations.

36. In a section titled *Police Practices*, the Department of Justice concluded:

> Officers expect and demand compliance even when they lack legal authority. They are inclined to interpret the exercise of free-speech rights as unlawful disobedience, innocent movements as physical threats, indications of mental or physical illness as belligerence. Police supervisors and leadership do too little to ensure that officers act in accordance with law and policy, and rarely respond meaningfully to civilian complaints of officer misconduct. The result is a pattern of stops without reasonable suspicion and arrests without probable cause in violation of the Fourth Amendment; infringement on free expression, as well as retaliation for protected expression, in violation of the First Amendment; and excessive force in violation of the Fourth Amendment.

Exh. 2 at 2-3.

37. The Department of Justice further details:

> In Ferguson . . . officers frequently make enforcement decisions based on what subjects say, or how they say it. Just as officers reflexively resort to arrest immediately upon noncompliance with their orders, whether lawful or not, they are quick to overreact to challenges and verbal slights. These incidents—sometimes called "contempt of cop" cases—are propelled by officers' belief that arrest is an appropriate response to disrespect. These arrests are typically charged as a Failure to Comply, Disorderly Conduct, Interference with Officer, or Resisting Arrest.

*Id.* at 25.

38. The Department of Justice found:

> Officers frequently arrest individuals under Section 29-16(1) on facts that do not meet the provision's elements. Section 29-16(1) makes it unlawful to "[f]ail to comply with the lawful order or request of a police officer in the discharge of the officer's official duties where such failure interfered with, obstructed or hindered the officer in the performance of such duties." Many cases initiated under this provision begin with an officer ordering an individual to stop despite lacking objective indicia that the individual is engaged in wrongdoing. The order to stop is not a "lawful order" under

6

> those circumstances because the officer lacks reasonable suspicion that criminal activity is afoot.

*Id.* at 19.

39. The Department of Justice further concluded that FPD "engages in a pattern of First Amendment violations," arresting people for "talking back to officers, recording public police activities, and lawfully protesting perceived injustices." *Id.* at 24.

40. FPD officers claim, without factual support, that citizens threaten officer safety by using their cell phones to record police activity; sometimes, officers provide no rationale whatsoever for preventing citizens from recording. *Id.* at 26.

41. Citing an incident that occurred just a month before the instant matter, the Department of Justice noted Defendant Boyd's conduct as an example of FPD's pattern of First Amendment violations, stating:

> In June 2014, an African-American couple who had taken their children to play at the park allowed their small children to urinate in the bushes next to their parked car. An officer stopped them, threatened to cite them for allowing the children to "expose themselves," and checked the father for warrants. When the mother asked if the officer had to detain the father in front of the children, the officer turned to the father and said, "you're going to jail because your wife keeps running her mouth." The mother then began recording the officer on her cell phone. The officer became irate, declaring, "you don't videotape me!" As the officer drove away with the father in custody for "parental neglect," the mother drove after them, continuing to record. The officer then pulled over and arrested her for traffic violations. When the father asked the officer to show mercy, he responded, "no more mercy, since she wanted to videotape," and declared "nobody videotapes me." The officer then took the phone, which the couple's daughter was holding. After posting bond, the couple found that the video had been deleted.

*Id.* at 27. The couple identified above, along with their four minor children, filed a civil complaint against Defendant Boyd. *See Rice v. City of Ferguson*, 4:19-cv-01563-RLW (E.D. Mo. June 3, 2019).

42. The Department of Justice also cited the instant matter as an example of FPD's pattern of retaliatory arrests, stating:

> A month later, the same officer pulled over a truck hauling a trailer that did not have operating tail lights. The officer asked for identification from all three people inside, including a 54-year-old white man in the passenger seat who asked why. "You have to have a reason. This is a violation of my Fourth Amendment rights," he asserted. The officer, who characterized the man's reaction as "suspicious," responded, "the reason is, if you don't hand it to me, I'll arrest you." The man provided his identification. The officer then asked the man to move his cell phone from his lap to the dashboard, "for my safety." The man said, "okay, but I'm going to record this." Due to nervousness, he could not open the recording application and quickly placed the phone on the dash. The officer then announced that the man was under arrest for Failure to Comply. At the end of the traffic stop, the officer gave the driver a traffic citation, indicated at the other man, and said, "you're getting this ticket because of him." Upon bringing that man to the jail, someone asked the officer what offense the man had committed. The officer responded, "he's one of those guys who watches CNBC too much about his rights." The man did not say anything else, fearing what else the officer might be capable of doing. He later told us, "I never dreamed I could end up in jail for this. I'm scared of driving through Ferguson now."

Exh. 2 at 27.

43. One FPD officer the Department of Justice interviewed admitted that, as a matter of course, he asks all passengers for identification when he conducts a traffic stop. *Id.* at 21. He considers refusal to be "furtive and aggressive" conduct necessitating citations and, typically, arrests. *Id.* Defendant Boyd follows the same course. Exh. 1 at 13:25-14:5.

44. The Department of Justice criticized FPD's failure to curb the conduct described above:

> Good supervision would correct improper arrests by an officer before they became routine. But in Ferguson, the same dynamics that lead officers to make unlawful stops and arrests cause supervisors to conduct only perfunctory review of officers' actions—when they conduct any review at all. FPD supervisors are more concerned with the number of citations and arrests officers produce than whether those citations and arrests are lawful or promote public safety. Internal communications among command staff reveal that FPD for years has failed to ensure even that officers write their

> reports and first-line supervisors approve them. In 2010, a senior police official complained to supervisors that every week reports go unwritten, and hundreds of reports remain unapproved. "It is time for you to hold your officers accountable," he urged them. In 2014, the official had the same complaint, remarking on 600 reports that had not been approved over a six-month period. Another supervisor remarked that coding errors in the new records management system is set up "to hide, do away with, or just forget reports," creating a heavy administrative burden for supervisors who discover incomplete reports months after they are created. In practice, not all arrests are given incident numbers, meaning supervisors may never know to review them. These systemic deficiencies in oversight are consistent with an approach to law enforcement in which productivity and revenue generation, rather than lawful policing, are the priority. Thus, even as commanders exhort line supervisors to more closely supervise officer activity, they perpetuate the dynamics that discourage meaningful supervision.

Exh. 2 at 22.

45. The Department of Justice further articulated how these deficiencies are compounded and ratified by the Ferguson Municipal Court:

> The Ferguson municipal court handles most charges brought by FPD, and does so not with the primary goal of administering justice or protecting the rights of the accused, but of maximizing revenue. The impact that revenue concerns have on court operations undermines the court's role as a fair and impartial judicial body. Our investigation has uncovered substantial evidence that the court's procedures are constitutionally deficient and function to impede a person's ability to challenge or resolve a municipal charge, resulting in unnecessarily prolonged cases and an increased likelihood of running afoul of court requirements.

*Id.* at 42.

46. The Department of Justice report details multiple incidents of the municipal judge, municipal prosecutor, and court clerk making criminal charges disappear for each other and their friends, both in Ferguson and the surrounding municipalities where they were also employed. *Id*. at 74-75.

47. The Department of Justice noted that there are at least three cases in which Defendant Boyd was called as a witness, and the municipal prosecutor withheld impeachment

9

evidence that Defendant Boyd had been found untruthful in an official FPD investigation. *Id.* at 44, n. 23.

48. On March 8, 2015, the Missouri Supreme Court took what it called the "extraordinary action" of reassigning all cases before Judge Brockmeyer of the Ferguson Municipal Court to St. Louis County Circuit Court. Later that day, Judge Brockmeyer resigned his position.

49. In August 2015, the court clerk was fired after the Department of Justice report revealed that she had sent racist emails.

50. On May 23, 2016, the Ferguson municipal prosecutor resigned her position.

51. Indeed, Defendant City has a troubled history of impropriety and lawlessness that serves to ratify its officers' misconduct.

52. Defendant Boyd has his own long history of unprofessional and unconstitutional actions.

53. Before working for Defendant City, Defendant Boyd worked for the St. Louis Metropolitan Police Department ("SLMPD").

54. While working for SLMPD, Defendant Boyd was accused of physical abuse in at least four separate incidents. The first two were in 2004 and 2005.

55. The third occurred in 2006. In that incident, SLMPD found that Defendant Boyd pistol-whipped a 12-year-old girl and falsified a police report. Defendant Boyd was demoted as a result.

56. Later, SLMPD investigated Defendant Boyd for pistol whipping a 16-year-old boy – an incident separate from his pistol whipping of a 12-year-old girl.

57. Rather than defend himself, Defendant Boyd resigned and later took a position with

the St. Ann Police Department. It is unknown whether Defendant Boyd left St. Ann as a result of malfeasance similar to his SLMPD malfeasance.

58. Even though Defendant Boyd had a long history of abuse complaints and had pistol whipped two separate juveniles, Defendant City chose to overlook his abusive past and hire him in 2010.

59. Since that date, Defendant Boyd has been accused of multiple unlawful, abusive, and unconstitutional acts. On top of the at least three incidents involving Defendant Boyd highlighted in the Department of Justice report, he has been accused of at least three other incidents that closely parallel what he did to Plaintiff.

60. On December 7, 2015, Angelique Kidd sued Defendant Boyd alleging that he arrested her for recording his interactions with citizens and asking Defendant Boyd for his name. *See Kidd v. Boyd*, No. 4:15-cv-01801 (E.D. Mo.), Doc. 1. The arrest occurred on November 12, 2015. The matter was dismissed pursuant to a settlement on December 7, 2016. *Id.* at 29.

61. On January 21, 2016, Defendants were sued for allegedly unlawfully arresting protestors in retaliation for their First Amendment protected activities. *Phillips v. City of Ferguson*, 4:16-cv-00084 (E.D. Mo.), Doc. 1. During the arrest, it was alleged that Defendant City attempted to destroy video evidence of its malfeasance. *Id*. at Doc. 22-1 ¶¶ 41, 48, 60-63, 86-88. The matter was dismissed pursuant to a settlement on January 24, 2017. *Id.* at Doc. 43.

62. On July 31, 2017, Fred Watson sued Defendants alleging that Defendant Boyd unlawfully arrested and initiated charges against Watson without probable cause and in retaliation for Watson engaging in protected First Amendment conduct, first by questioning Defendant Boyd's authority to demand irrelevant personal information and then by lodging a complaint in protest to Defendant Boyd's actions. *Watson v. Boyd*, 4:17-cv-02187 (E.D. Mo.), Doc. 1. This

arrest occurred on August 1, 2012. After more than five years, Defendant City finally dropped the charges against Watson.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
### (Against Defendant Boyd)

63.     Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

64.     Mr. Mentzel has a fundamental right to question and record police, under the freedom of speech clause of the First Amendment, as applied to the states under the Fourteenth Amendment.

65.     Defendant Boyd violated Mr. Mentzel's First Amendment rights by forcing him to cease his efforts to record their interaction.

66.     Mr. Mentzel complied with Defendant Boyd's unlawful orders to provide his driver's license and cease recording.

67.     Motivated by Mr. Mentzel's exercise of his First Amendment rights, Defendant Boyd arrested Mr. Mentzel without probable cause.

68.     Defendant Boyd engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Mr. Mentzel's First Amendment rights.

69.     Defendant Boyd's actions chilled Mr. Mentzel and would chill a person of ordinary firmness from questioning or recording police action, important elements of free public discourse.

70.     As a direct and proximate result of Defendant Boyd's unlawful actions, Mr. Mentzel suffered damages, including emotional trauma, fear, apprehension, depression, anxiety, consternation, and emotional distress.

71. At all times, Defendant Boyd acted under color of state law.

72. If Mr. Mentzel prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

### COUNT II
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations
### Unreasonable Search and Seizure
### (Against Defendant Boyd)

73. Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

74. Defendant Boyd's demand for and examination of Mr. Mentzel's driver's license constitutes a search. Mr. Mentzel did not voluntarily consent to Defendant Boyd's search.

75. Defendant Boyd did not have reasonable suspicion to search or probable cause to arrest Mr. Mentzel.

76. Defendant Boyd deprived Mr. Mentzel of his right to be free from unreasonable search of his property and seizure of his person, in violation of the Fourth and Fourteenth Amendments.

77. Defendant Boyd engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Mr. Mentzel's Fourth Amendment rights.

78. As a direct and proximate cause of Defendant Boyd's unlawful actions, Mr. Mentzel suffered damages, including physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for his own safety.

79. At all times, Defendant Boyd acted under color of state law.

80. If Mr. Mentzel prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

## COUNT III
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations
### Excessive Force
### (Against Defendant Boyd)

81. Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

82. Under the Fourth Amendment, any force an officer employs, not in the performance of his lawful duties but for "some other improper purpose" is unreasonable. *Bauer v. Norris*, 713 F.2d 408, 413 (8th Cir. 1983).

83. Defendant Boyd did not have probable cause to arrest Mr. Mentzel. Instead, Defendant Boyd arrested Mr. Mentzel for the improper purpose of punishing him for his exercise of his First Amendment rights.

84. Therefore, Defendant Boyd's use of force in handcuffing Mr. Mentzel, especially in cuffing Mr. Mentzel tightly enough to cause pain in Mr. Mentzel's hands, was unreasonable and excessive.

85. Defendant Boyd engaged in this unlawful action willfully and knowingly, acting with reckless or deliberate indifference to Mr. Mentzel's Fourth Amendment rights.

86. As a direct and proximate cause of Defendant Boyd's unlawful action, Mr. Mentzel suffered damages, including physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for his own safety.

87. At all times, Defendant Boyd acted under color of state law.

88. If Mr. Mentzel prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

## COUNT IV
## 42 U.S.C. § 1983 – Municipal Liability
### *Monell* Claim against Defendant City for Customs of Using Excessive Force and Conducting Unreasonable Seizures and for Failing to Train, Supervise, and Screen

89. Each allegation contained in the preceding paragraphs is incorporated by reference as if fully set forth herein.

90. Defendant City is liable for the excessive force Defendant Boyd inflicted on Mr. Mentzel because it was caused by Defendant City's custom of excessive force and its failure to supervise its' officers.

91. According to the Department of Justice, FPD officers are "quick to escalate encounters with subjects they perceive to be disobeying their orders or resisting arrest . . . Some incidents of excessive force result from stops or arrests that have no basis in law. Others are punitive and retaliatory." Exh. 2 at 28. FPD officers regularly use force as punishment for conduct that is merely "annoying or distasteful," rather than threatening or aggressive. *Id.* at 33.

92. As was the case during incidents in January 2013, January 2014, and June 2014, "[o]fficers frequently compound the harm by using excessive force to effect the unlawful police action." *Id.* at 27, 34-35.

93. Worse, the Department of Justice report provides that FPD officers frequently avoid reporting uses of force and FPD supervision is disastrously inadequate:

> Even when force is reported, the force review process falls so short of FPD's policy requirements that it is ineffective at improving officer safety or ensuring that force is used properly. First, and most significantly, supervisors almost never actually investigate force incidents. In almost every case, supervisors appear to view force investigations as a ministerial task, merely summarizing the involved officers' offense report alone. The supervisory review starts and ends with the presumption that the officer's version of events is truthful and that the force was reasonable. As a consequence, though contrary to policy, supervisors almost never interview

>   non-police witnesses, such as the arrestee or any independent witnesses. They do not review critical evidence even when it is readily available.

*Id.* at 38-39.

94. Additionally, Defendant City is liable for harms Defendant Boyd's constitutional violations inflicted on Mr. Mentzel because the violations were caused by Defendant City's custom of arresting individuals without probable cause, as punishment for their exercise of their First Amendment rights.

95. Defendant City had notice that its training and supervision was inadequate and likely to result in constitutional violations based on multiple incidents of officers arresting people for engaging in First Amendment protected activity in December 2011, July 2012, September 2012, March 2013, February 2014, May 2014, and June 2014. *Id.* at 21, 25-27.

96. As articulated in the Department of Justice report, FPD officers describe their own infringement on citizens' First Amendment rights in their offense reports, reflecting that they believe "criticism and insolence are grounds for arrest" and "supervisors have condoned such unconstitutional policing." *Id.* at 26.

97. Further, despite Defendant Boyd's history of untruthfulness, Defendant City continued to use his testimony to impose quasi-criminal sanctions on its residents, ratifying his impropriety.

98. Finally, Defendant City failed to adequately screen Defendant Boyd before hiring him. A simple review of Defendant Boyd's employment record would have revealed that he had a propensity for excessive force. Defendant City was deliberately indifferent to the plainly obvious risk that Defendant Boyd would continue to use excessive force on citizens.

99. In its failures, Defendant City has been deliberately indifferent to the rights of its residents, and those failures and customs are the moving force behind, and direct and proximate

16

cause of, the constitutional violations Mr. Mentzel suffered.

100. As a direct result of Defendant City's customs and failures, Mr. Mentzel suffered damages, including physical injury, fear, apprehension, and concern for his own safety.

101. If Mr. Mentzel prevails, he is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff prays for judgment against all Defendants for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: July 11, 2019                           Respectfully Submitted,

                                              KHAZAELI WYRSCH LLC

                                              /s/ Kiara N. Drake
                                              James R. Wyrsch, MO53197
                                              Javad Khazaeli, MO 53735
                                              Kiara Drake, MO 67129
                                              911 Washington Avenue, Suite 211
                                              Saint Louis, MO 63101
                                              (314) 288-0777
                                              (314) 400-7701 (fax)
                                              james.wyrsch@kwlawstl.com
                                              javad.khazaeli@kwlawstl.com
                                              kiara.drake@kwlawstl.com